UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

───────────────────────────────────────────

NICOLE HABERLE,                                      :
in her own right, on behalf of her two minor         :
children, and as administrator for                   :
the Estate of Timothy Nixon, deceased,               :
                                                     :
                        Plaintiff,                   :
            v.                                       :          No. 5:15-cv-02804
                                                     :
OFFICER DANIEL TROXELL;                              :
MAYOR CARL STYRE;                                    :
PRESIDENT DAN CHIAVAROLI;                            :
VICE-PRESIDENT LARRY STOUDT;                         :
COUNCIL MEMBER JOHN SAMUS;                           :
COUNCIL MEMBER MICAEL KOPACH;                        :
COUNCIL MEMBER FRANK MAUREK;                         :
COUNCIL MEMBER CHARLES DONELLO;                      :
COUNCIL MEMBER CARL FISCHL;                          :
JOHN/JANE DOE POLICE STAFF #1-X;                     :
THE BOROUGH OF NAZARETH,                             :
                                                     :
                        Defendants.                  :

───────────────────────────────────────────

## MEMORANDUM OPINION

**Defendants' Motion to Dismiss Plaintiff's Amended Complaint, ECF No. 18 - Granted**

**Joseph F. Leeson, Jr.**                                          **March 29, 2016**
**United States District Judge**

## I.      Introduction

On the morning of May 20, 2013, Plaintiff Nicole Haberle received a call from Timothy

Nixon, whom she had been living with "on and off" for fourteen years, telling her that he was

contemplating suicide. Am. Compl. ¶¶ 23, 24. Nixon had a long history of mental health

problems, and according to Haberle, his condition was well known to residents in the community

of the Borough of Nazareth and to the Borough's police department. Id. ¶ 22. At some time after

1

calling Haberle, Nixon broke into the home of a friend and obtained the friend's handgun. See id. ¶¶ 24-25. Haberle learned that Nixon had obtained a firearm, and, fearing that he would carry out his threat, she contacted the Borough of Nazareth police department. Id. ¶¶ 26-27. Defendant Daniel Troxell, a Borough of Nazareth police officer, obtained a warrant for Nixon's arrest[1] and proceeded to Haberle's home in search of information to help him locate Nixon. See id. ¶¶ 28-29. Troxell learned that Nixon was located at the apartment of his cousin.[2]

Troxell and other officers from the Borough of Nazareth and surrounding municipalities responded. Id. ¶ 31. Some officers from other municipalities recommended that "a perimeter be established and that trained crisis negotiators from the Pennsylvania State Police be summoned to the scene." Id. ¶ 32. An officer from Upper Nazareth Township reportedly said, "I don't like this. This is dangerous. Somebody is gonna' get hurt."[3] Id. at ¶¶ 33. Some officers suggested that they attempt to communicate with Nixon, but Troxell disagreed and did not attempt to communicate with Nixon or any of the adults in the apartment or to summon Haberle to the scene to do so. Id. ¶ 34. Troxell allegedly said, "You're a bunch of f---ing pussies. This is how we do things in Nazareth," and said "if they didn't want to do it, he would go to the scene and do it himself."[4] Id. ¶ 35. Troxell then knocked at the door of the apartment where Nixon was located "and presumably identified himself as a police officer." Id. ¶ 36. Nixon responded "by walking into another room [of the apartment] alone and putting the gun to his head, tragically taking his own life." Id.

---

[1]     The Amended Complaint does not indicate the grounds for the warrant.
[2]     Haberle alleges that "[d]ocuments provided by counsel for the Defendants suggest that [Nixon's cousin] and his girlfriend were peacefully talking with [Nixon] while they were consuming a portion of two cases of beer which [his cousin] had purchased for [Nixon]" and that these documents "suggest that [Nixon] did not threaten any of the occupants in the apartment in any way, and, to the contrary was permitted for part of the evening to stay by himself with two minor children in the apartment." Because Haberle alleges that she learned this information from documents in the possession of the Defendants, it does not appear that she was aware of this information at the time of the incident or that she communicated any of this information to Troxell.
[3]     Haberle explains that this comment was reported by the media. See Am. Compl. ¶ 33.
[4]     The Amended Complaint does not explain what Troxell meant when he said he was going to do "it."

Haberle brought this action on behalf of herself, Nixon's estate, and her two minor children. She claims that Troxell violated a number of Nixon's constitutional rights and that his conduct constituted intentional infliction of emotional distress. She also claims that various supervisors of Troxell are liable under these circumstances, and that the various Defendants engaged in a civil conspiracy to violate the constitutional rights of the residents of Nazareth. Finally, she claims that the Borough of Nazareth is liable for the violations of Troxell's constitutional rights, and that the Borough discriminated against Nixon in violation of the Americans with Disabilities Act of 1990 ("ADA") "by failing to make reasonable modifications to their policies, practices and procedures to ensure that his needs as an individual with a disability would be met." Id. ¶ 83.

Defendants have moved to dismiss each of these claims. Because the allegations in the Amended Complaint fail to state a claim upon which relief can be granted, the Amended Complaint is dismissed.

## II.      Standard of review – Motion to dismiss for failure to state a claim

The defendant bears the burden of demonstrating that a plaintiff has failed to state a claim upon which relief can be granted. Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005) (citing Kehr Packages, Inc. v. Fidelcor, Inc., 926 F.2d 1406, 1409 (3d Cir. 1991)). This Court must "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." See Phillips v. Cnty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)) (internal quotation marks omitted).

In Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), the Supreme Court recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555 (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). In Ashcroft v. Iqbal, 556 U.S. 662 (2009), the Court subsequently laid out a two-part approach to reviewing a motion to dismiss under Rule 12(b)(6).

First, the Court observed, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. at 678. Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to survive the motion; "instead, 'a complaint must allege facts suggestive of [the proscribed] conduct.'" Id.; Phillips, 515 F.3d at 233 (quoting Twombly, 550 U.S. at 563 n.8). While Rule 8, which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," was "a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." Iqbal, 556 U.S. at 678-79 ("Rule 8 . . . demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citing Twombly, 550 U.S. at 555)); see Fed. R. Civ. P. 8(a)(2). For "without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice' but also the 'grounds' on which the claim rests." Phillips, 515 F.3d 224, 232 (citing Twombly, 550 U.S. at 555 n.3).

Second, the Court emphasized, "only a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief . . . [is] a context-specific task that requires the reviewing court to draw on its judicial experience

and common sense." Iqbal, 556 U.S. at 678. Only if "the '[f]actual allegations . . . raise a right to relief above the speculative level'" has the plaintiff stated a plausible claim. Phillips, 515 F.3d at 234 (quoting Twombly, 550 U.S. at 555). This is because Rule 8(a)(2) "requires not merely a short and plain statement, but instead mandates a statement 'showing that the pleader is entitled to relief.'" See id., 515 F.3d at 234 (quoting Fed. R. Civ. P. 8(a)(2)). If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Detailed factual allegations" are not required, id. at 678 (quoting Twombly, 550 U.S. at 555), but a claim must be "nudged . . . across the line from conceivable to plausible," id. at 680 (quoting Twombly, 550 U.S. at 570).

"The plausibility standard is not akin to a 'probability requirement,'" but there must be "more than a sheer possibility that a defendant has acted unlawfully." Id. at 678 (quoting Twombly, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" Id. (quoting Twombly, 550 U.S. at 557)).

## III.    Haberle has failed to state a claim under § 1983.

### A.    Nixon was not "seized" within the meaning of the Fourth Amendment.

Citing to Graham v. Connor, 490 U.S. 386 (1989), Haberle contends that the officers who responded to the apartment violated Nixon's rights under the Fourth Amendment by seizing him in an objectively unreasonable manner.[5] The Fourth Amendment guarantees the "right of the people to be secure . . . against unreasonable seizures" of their persons, U.S. Const. amend IV,

---

[5]    Haberle brings this claim against each of the individual Defendants, but the only conduct that she contends was unreasonable was Troxell's decision to knock on the apartment door. Pl.'s Mem. Opp'n 13-14, ECF No. 20. Nonetheless, because her allegations fail to establish a violation of the Fourth Amendment, this claim is dismissed against each Defendant.

and "the 'reasonableness' of a particular seizure depends not only on <u>when</u> it is made, but also on <u>how</u> it is carried out." <u>Graham</u>, 490 U.S. at 395 (citing <u>Tennessee v. Garner</u>, 471 U.S. 1, 7-8 (1985)). Because "[t]he Fourth Amendment covers only 'searches and seizures,'" there must have been a "seizure" within the meaning of the Fourth Amendment for these protections to be triggered. <u>Cty. of Sacramento v. Lewis</u>, 523 U.S. 833, 843-45 & n.7 (1998) (recognizing that "a police pursuit in attempting to seize a person does not amount to a 'seizure' within the meaning of the Fourth Amendment," which meant that a police chase that ended when the pursuing officer accidentally struck a fleeing motorcyclist did not implicate the Fourth Amendment).

"[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980) (Opinion of Stewart, J.), and the person submits to that restraint. <u>See</u> <u>California v. Hodari D.</u>, 499 U.S. 621, 629 (1991). However, when the encounter occurs in a place where a person "has no desire to leave," the more appropriate inquiry may be to ask "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." <u>See</u> <u>Florida v. Bostick</u>, 501 U.S. 429, 437 (1991). According to Haberle, Nixon had been seized at the time that Troxell knocked on the door to his cousin's apartment because Troxell appeared at the door to his cousin's apartment possessing an arrest warrant and the other responding officers had established a perimeter at the scene.[6]

There are a number of difficulties with this argument. The first is that Haberle does not allege that Nixon was aware that the police had arrived at the apartment prior to the moment that he took his life—other than Troxell, who knocked on his door. A reasonable person in Nixon's position would not have believed that the police had restrained his or her ability to leave the

---

[6]     Pl.'s Mem. Opp'n 13.

apartment if that person was unaware of their very presence. See Estate of Bennett v. Wainwright, 548 F.3d 155, 171 (1st Cir. 2008) ("Given the Estate's failure to establish [the decedent's] knowledge of the [police] perimeter, no reasonable factfinder could find that a person in [the decedent's] circumstances would have thought that the perimeter restricted his liberty to leave the . . . residence.").

Even if Nixon was aware that the police had arrived at his apartment, Haberle does not allege that they had created a perimeter around the apartment by the time that Nixon took his life. Quite the opposite: Haberle alleges that while some officers at the scene "recommended that a perimeter be established," Troxell rejected the "reasonable advice of the officers" and instead, he "arrived at the apartment building . . . and immediately confronted the apartment." See Am. Compl. ¶¶ 32, 35-36; cf. Ewolski v. City of Brunswick, 287 F.3d 492, 506 (6th Cir. 2002) (officers effected a seizure of an occupant of home when they established perimeters, evacuated neighbors, and "paraded an armored vehicle in front of the . . . house"); United States v. Al-Azzawy, 784 F.2d 890, 893 (9th Cir. 1985) (finding a seizure to have occurred when police officers surrounded a trailer with their guns drawn and ordered the occupant through a bullhorn to exit). The mere fact that police had arrived at the apartment does not mean, at that time, that a reasonable person would have felt as though they could not decline whatever entreaty the officers might make when they arrived at the door.

Haberle also does not allege that Nixon knew that Troxell had obtained a warrant for his arrest. Rather, Haberle alleges that Troxell "refused to communicate with [Nixon] . . . [or] any of the adults in the apartment" before approaching the door of the apartment, and that Troxell's only communication with the occupants was to knock on the door "and presumably identif[y] himself as a police officer." See Am. Compl.¶¶ 34, 36. A police officer who has done nothing

more than knock on the door of a residence and announce himself has not effected a seizure of a person inside, or conveyed to the occupants that they were not "free to ignore the [officer] and to continue about their business." Cf. United States v. Jerez, 108 F.3d 684, 691-92 (7th Cir. 1997) (finding police to have seized the occupants of a motel room after they knocked on the door for three minutes, identified themselves as police officers, commanded the occupants to open the door, knocked on the window, and shined a flashlight into the room, all at approximately 11:00 p.m.); accord United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008) (concluding a seizure had occurred where police "pounded on [the] door and window" of a motel room "while yelling and loudly identifying themselves as police officers" for "at least twenty minutes" between 2:30 and 3:00 a.m.).

Taking Haberle's allegations as true, Nixon was not seized within the meaning of the Fourth Amendment at the time he took his life. Accordingly, Haberle's claims under the Fourth Amendment must fail.[7]

**B.     Nixon's right to be free from "state-created danger" was not infringed.**

The Constitution does not impose an affirmative obligation on the state to protect its citizens, but there is an exception to that general rule that applies when a person is harmed by a danger that the state created. This theory of liability finds its source in the substantive component of the Due Process Clause, and to establish it, a plaintiff must establish the following:

> (1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed.

---

[7]     Haberle has also asserted a claim for "Denial of Medical Care" against various Defendants. However, Haberle concedes that this claim rests on the premise that Nixon "was in the custody of the various law enforcement agencies present and was owed a duty of care with respect to his known health issues." See Pl.'s Mem. Opp'n 19. Because Nixon was not in custody prior to his death, this claim also fails.

Phillips v. Cty. of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citing Bright v. Westmoreland Cty., 443 F.3d 276, 281 (3d Cir. 2006)). According to Haberle, Nixon's death was the result of danger that the state created.

Only if the state actor "acted with a degree of culpability that 'shocks the conscience'" can the actor be held liable under this theory. Id. at 240 (citing Bright, 443 F.3d at 281)). There is a continuum of conduct that may be conscience-shocking, which largely depends upon the extent to which the state actor had the opportunity to deliberate before acting. "[W]here officials are afforded the luxury of a greater degree of deliberation and have time to make 'unhurried judgments,'" their deliberate indifference to a substantial risk of serious bodily harm may shock the conscience. See id. (quoting Sanford v. Stiles, 456 F.3d at 306 (3d Cir. 2006)). On the opposite end of the spectrum are the "split-second" decisions that officials must make in a "hyperpressurized environment." Under that sort of pressure, an official's conduct only shocks the conscience if the official deliberately intended to cause harm. See id. at 240-41 (quoting Sanford, 456 F.3d at 306). In the middle are those "circumstances [that] require a state actor to make something less exigent than a 'split-second' decision but more urgent than an 'unhurried judgment,'" which usually means that action is required "in a matter of hours or minutes." Id. at 241 (quoting Sanford, 456 F.3d at 306). When that is the case, a state actor's conduct may shock the conscience if he or she "consciously disregarded, not just a substantial risk, but a great risk that serious harm would result." Sanford, 456 F.3d at 307, 310 (quoting Ziccardi v. City of Phila., 288 F.3d 57, 66 (3d Cir. 2002)).

Haberle suggests that Troxell had time to make an "unhurried judgment" as to how to proceed, because when the police arrived at the apartment, Nixon was "peacefully playing video games and drinking beers with his cousin and his cousin's girlfriend" and had been "permitted to

stay alone with the cousin's minor children" earlier in the evening. See Pl.'s Mem. Opp'n 16-17. But Haberle does not suggest that any of this was known to Troxell. Instead, when Troxell arrived on the scene, he knew that Nixon had called Haberle to tell her that he was contemplating suicide, had broken into a friend's house and stolen a firearm, and had "a long history of mental health issues." See Am. Compl. ¶¶ 22, 25-30. The Amended Complaint does not indicate whether Troxell knew that Nixon's cousin, his cousin's girlfriend, and their two children were present in the apartment with him, but because the apartment belonged to Nixon's cousin, there existed the possibility that Nixon was not the only person present. See Estate of Smith v. Marasco, 318 F.3d 497, 509 (3d Cir. 2003) (recognizing that whether there are "concern[s] about the safety of third parties" affects the time that police officers have to deliberate). These were not circumstances that allowed Troxell the luxury of time to deliberate. This is not to say that Troxell had to act in a "split-second," but action was required at least "in a matter of minutes or hours."

Under those circumstances, Troxell's decision to knock on the door of the apartment does not shock the conscience. In her briefing, Haberle characterizes Troxell's actions as "deadly Ramboesque vigilantism,"[8] but according to her Amended Complaint, when Troxell arrived on the scene, he simply "knocked on the door and . . . identif[ied] himself as a police officer." Am. Compl. ¶ 36. Whether that was even the wrong decision would be a matter of some dispute in light of what was known to Troxell when he arrived. At that moment, the authorities needed to ascertain, at the least, whether Nixon was still located in the apartment or whether he had left the apartment with the firearm, whether he posed a threat to any other occupants, and whether he may be in need of medical attention. Troxell's decision to respond to this variety of concerns by approaching the apartment and knocking on the door is not indicative of "gross negligence or

---

[8]       See Pl.'s Mem. Opp'n 17.

arbitrariness that indeed shocks the conscience." See Phillips, 515 F.3d at 241 (citing Sanford, 456 F.3d at 306).

Haberle places great weight on the exchange that occurred between the officers before Troxell proceeded to the apartment door. To Haberle, those comments suggest that the other officers were concerned that Nixon may harm himself if they approached, and that Troxell "consciously disregarded the admittedly foreseeable harm that befell [Nixon]" when he decided otherwise.[9] The exchange, however, may be subject to more than one interpretation. The other officers, one of whom allegedly said, "I don't like this. This is dangerous. Somebody is gonna' get hurt," Am. Compl. ¶ 33, may have been expressing their concerns about the risks to them of approaching a person who had stolen a firearm and was suffering from mental illness. Troxell's comments in response may have simply been an expression of his belief (albeit ineloquent) that they needed to ascertain what was happening inside of the apartment sooner rather than later, even if that meant that they may find themselves in harm's way. See Am. Compl. ¶ 34.

Nevertheless, even if Troxell's comments reveal that he failed to account for the risk his actions posed to Nixon, his conduct was not so risky that it shocks the conscience. There is no indication that a reasonable officer on the scene that day would have known that simply knocking on the apartment door posed "a great risk that serious harm would result" to Nixon. Cf. Heckenswiler v. McLaughlin, No. CIV. 06-4151, 2008 WL 4442945, at *13-14 (E.D. Pa. Sept. 29, 2008) (finding that an officer's decision to activate state and local special response teams, which respond with an "overwhelming show of force," to confront a suspect who felt trapped and who proceeded to commit suicide may have shocked the conscience). Under the circumstances that the officers were confronting, any decision they could have made—including Haberle's suggestion that the officers should have waited for assistance from officers of the

---

[9]     See Pl.'s Mem. Opp'n 17.

11

Pennsylvania State Police who had "training in dealing with mentally incapacitated individuals"[10]—was not free from risk to Nixon, the other occupants of the apartment, or the officers. See Ewolski v. City of Brunswick, 287 F.3d 492, 515 (6th Cir. 2002) (recognizing that when "officers must choose among risks, a plaintiff must show that the police 'knowingly and unreasonably' opted for a course of conduct that entailed a substantially greater total risk than the available alternatives" (quoting Farmer v. Brennan, 511 U.S. 825, 846 (1994))). Troxell's choice to attempt to establish face-to-face contact with the occupants of the apartment was not "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." See Cty. of Sacramento, 523 U.S. at 847 n.7. Haberle says in her brief that Troxell "stormed the apartment" for the purpose of "prov[ing] his manhood,"[11] but that characterization cannot be squared with her allegations that the only action he took was to knock on the apartment door. In light of the tragedy that ultimately befell Nixon, it is natural to second-guess the decisions of Troxell and the other officers, but the approach that Troxell took is not the mark of a "state-actor act[ing] in willful disregard for [Nixon's] safety." See Cty. of Allegheny, 515 F.3d at 235 (citing Bright, 443 F.3d at 281).[12]

## C.     Haberle has failed to plausibly allege the existence of a conspiracy to deprive Nixon of his constitutional rights.

"In order to prevail on a conspiracy claim under § 1983, a plaintiff must prove that persons acting under color of state law conspired to deprive him of a federally protected right." Ridgewood Bd. of Educ. v. N.E. ex rel. M.E., 172 F.3d 238, 254 (3d Cir. 1999) (citing Dennis v. Sparks, 449 U.S. 24, 29 (1980); Lake v. Arnold, 112 F.3d 682, 689 (3d Cir. 1997)). Haberle cites

---

[10]     See id. at 15.
[11]     See id. at 14.
[12]     Separate from the state-created danger theory of substantive due process liability, Haberle also contends that Troxell violated Nixon's more generalized right to be free from the arbitrary and oppressive exercise of government power. See Cty. of Sacramento, 523 U.S. at 845-46. This too requires a showing that the state's abuse of power shocks the conscience, see id. at 846-48, and for these same reasons, this theory of liability also fails.

to a variety of unrelated incidents of civil rights violations that have allegedly occurred in the Borough of Nazareth for the proposition that the "supervisors and policymakers of the Borough" made a "conscious decision to violate the [c]onstitutional rights of those whom the Borough Police Department might encounter."[13] A plaintiff seeking to prevail on a claim of conspiracy under § 1983 must set forth "enough factual matter (taken as true) to suggest that an agreement was made," and these separate incidents, none of which bear any relation to the circumstances at issue here, cannot be woven together to plausibly suggest the existence of a conspiracy to violate Nixon's constitutional rights. See Great W. Mining & Mineral Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir. 2010) (quoting Twombly, 550 U.S. at 556).

Moreover, a claim of conspiracy in violation of § 1983 cannot stand absent a viable claim for an underlying constitutional violation. White v. Brown, 408 F. App'x 595, 599 (3d Cir. 2010) (citing Ridgewood, 172 F.3d at 254); Young v. New Sewickley Twp., 160 F. App'x 263, 267 (3d Cir. 2005). Having found that Nixon's constitutional rights were not violated, Haberle's § 1983 conspiracy claim must be dismissed.

**D.      The other individual defendants are not liable for failing to intervene.**

Haberle contends that certain yet-unknown state actors are liable for failing to intervene to prevent the violation of Nixon's constitutional rights. See Am. Compl. ¶¶ 62-67. A state actor may be held directly liable under § 1983 if a constitutional violation occurs in the actor's presence, and the state actor fails to intervene despite a realistic and reasonable opportunity to do so. See Smith v. Mensinger, 293 F.3d 641, 650-52 (3d Cir. 2002).[14] Necessarily, a constitutional violation must have been committed for an official to have failed to prevent it. See Adams v.

---

[13]     See Pl.'s Mem. Opp'n 26-27; Am. Compl. ¶ 42.
[14]     The court only had the occasion to discuss the possibility that a state actor could be liable for failing to intervene to prevent a police officer or a correctional officer from using excessive force, and did not explore whether the same reasoning may apply when state actors fail to prevent other kinds of constitutional violations.

Selhorst, 449 F. App'x 198, 204 (3d Cir. 2011) (citing Harper v. Albert, 400 F.3d 1052, 1064

(7th Cir. 2005)). Having found that Nixon's constitutional rights were not violated, this claim

must fail.

**E.    Neither the Borough of Nazareth nor any of the other individual Defendants are liable for failing to train or supervise Troxell.**

Neither municipalities nor supervisors may be held liable under § 1983 simply on a

theory of respondeat superior. See City of Canton, Ohio v. Harris, 489 U.S. 378, 385 (1989)

(citing Monell v. N.Y.C. Dep't of Soc. Serv., 436 U.S. 658, 694-95 (1989)); Santiago v.

Warminster Twp., 128 (3d Cir. 2010) (quoting Iqbal, 556 U.S. at 676). For municipalities, that

means that there must have been a "direct causal link between a municipal policy or custom and

the alleged constitutional deprivation," or that the municipality failed to adequately train the state

actor "and the constitutional wrong has been caused by that failure to train." See City of Canton,

489 U.S. at 385, 387.  The rules are generally the same for supervisors, who may be held liable if

they, "with deliberate indifference to the consequences, established and maintained a policy,

practice or custom which directly caused [the] constitutional harm," which may include a charge

that they failed to adequately train their subordinates. Barkes v. First Corr. Med., Inc., 766 F.3d

307, 316 (3d Cir. 2014) (quoting A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr., 372

F.3d 572, 586 (3d Cir. 2004)), rev'd on other grounds sub nom. Taylor v. Barkes, 135 S. Ct.

2042 (2015). Supervisors may also face liability if they "'participated in violating the plaintiff's

rights, directed others to violate them, or, as the person in charge, had knowledge of and

acquiesced' in the subordinate's unconstitutional conduct." Id.[15]

---

[15]    The Supreme Court's decision in Iqbal threw the concept of supervisory liability into flux. The Third Circuit has concluded that the result is that "the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged." Barkes, 766 F.3d at 319. So far, the Third Circuit has confirmed that the preexisting standard for supervisory liability in the context of an Eighth Amendment violation—deliberate indifference—is consistent with that dictate, because that standard mirrors the standard that applies to an underlying

Ordinarily, if no underlying constitutional violation has occurred, neither a supervisor nor a municipality can be subjected to liability. See McCann v. Borough of Magnolia, 581 F. App'x 125, 126 (3d Cir. 2014); Grazier ex rel. White v. City of Phila., 328 F.3d 120, 124 (3d Cir. 2003). However, the Third Circuit has recognized a narrow exception in cases where a plaintiff alleges that a municipality's failure to train its officers led to a substantive due process violation. In Fagan v. City of Vineland, 22 F.3d 1283, 1292 (3d Cir. 1994), the court held that even if an individual officer's conduct does not shock the conscience—and therefore does not amount to a substantive due process violation—a plaintiff may nonetheless be able to impose liability upon a municipality if the plaintiff can show that the officer was "following a city policy reflecting the city policymakers' deliberate indifference to constitutional rights."[16] The reason for this rule has to do with the nature of the "shocks the conscience" standard. If an individual officer is not properly trained, and therefore fails to appreciate the danger that his or her conduct presents, it is likely that the officer's conduct will not be found to have "shocked the conscience" because of the officer's ignorance of the risks. "Meanwhile, the city's policymakers, with a wealth of information available to them, [were] fully aware of those dangers but deliberately refuse[d] to require proper training." See id. Under the ordinary rule that a municipality cannot be held liable in the absence of an underlying constitutional violation, the municipality could avoid liability under these circumstances despite the fact that it was the municipal policymakers' deliberate indifference to the need for training that allowed the individual officer to escape liability. Fagan

---

Eighth Amendment violation. Here, as will be seen, Haberle's sole viable claim for supervisory liability rests on an allegation that both the Borough and the individual supervising officers failed to adequately train the subordinate officers. The standard governing a failure to train claim is deliberate indifference, see Gilles v. Davis, 427 F.3d 197, 207 n.7 (3d Cir. 2005), which matches the level of culpability that Haberle would have to show in connection with her substantive due process claims. This is so because a failure to train is necessarily a decision that an official makes with the luxury of time to deliberate, which means that an official's deliberate indifference to the need to provide additional training to subordinates could shock the conscience. See Phillips, 515 F.3d at 240 (quoting Sanford, 456 F.3d at 306).

[16]     Fagan dealt only with municipal liability, not supervisory liability, but the Court will assume that a supervisor who failed to train a subordinate could also be subjected to liability under the same theory.

therefore endorsed a rule that permits a municipality to be held liable if the municipality's deliberate indifference to the need for training is the reason that the individual officer's conduct failed to shock the conscience. See id. at 1292. Assuming that this theory is applicable here,[17] the question then becomes whether Haberle has stated a viable failure-to-train claim against the Borough of Nazareth.

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, 489 U.S. at 388. To meet this standard, the "need for more or different training" must be "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." See id. at 390. Thus, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for the purposes of failure to train." Connick v. Thompson, 563 U.S. 51, 62 (2011) (citing Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 409 (1997)).

Haberle contends that she has "identified numerous prior incidents which would have given Borough policymakers actual or constructive knowledge" of the need for further training.[18] In her Amended Complaint, Haberle makes reference to a series of incidents where either the Borough or individual Borough officers were allegedly found to have committed constitutional violations, such as a "use of excessive force involving a man who was repeatedly tased while

---

[17]      Since Fagan was decided, the Third Circuit has read it narrowly, suggesting that the holding may be limited to the specific facts of the case, which involved a high-speed police chase. See Grazier, 328 F.3d at 124 n.5. The court has even cast doubt upon the very soundness of Fagan's reasoning. See Mark v. Borough of Hatboro, 51 F.3d 1137, 1153 n.13 (3d Cir. 1995). Even if Fagan can be applied here, the rule it laid down does not appear to be a good fit to these circumstances. The primary reason that Troxell's conduct does not shock the conscience is not that he was ignorant to the risks that his conduct posed. Rather, the course of action he chose among the options that were available to the officers was not such an unreasonable one under the circumstances—if unreasonable at all—to be conscience-shocking behavior.

[18]      See Pl.'s Mem. Opp'n 26.

handcuffed," an "unlawful prosecution of three Borough residents for exercising their First Amendment rights," and two incidents of retaliatory termination of Borough employees. See Am. Compl. ¶ 42. These allegations are not sufficient to have put Borough policymakers on notice that their police officers needed additional training to confront the scenario that Troxell faced because none of those previous events bears even a passing similarly to these circumstances. These incidents, if they can be said to amount to pattern, reflect a pattern of constitutional violations, not a pattern of "similar constitutional violations."

There is a "possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." Connick, 563 U.S. at 63 (quoting Brown, 520 U.S. at 409). In other words, there exists the "the possibility, however rare, that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." See id. at 64. For example, the Court has suggested that "the need to train officers in the constitutional limitations on the use of deadly force" after issuing them firearms could "be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." See City of Canton, 489 U.S. at 390 n.10. This is not one of those rare cases. The failure to train police officers to refrain from doing so much as knocking on the door when they receive a call that a mentally ill individual has stolen a firearm, is contemplating suicide, and may be in the presence of others whose status is unknown is not so obvious that the Borough could be said to have been deliberately indifferent to the need for that training.

There is an additional difficulty with the contention that the Borough should have trained Troxell to take a different course of action under these circumstances. A failure to train only amounts to a constitutional violation if "the deficiency in training actually caused" the

constitutional harm, see id. at 391, which means that liability can only attach if "the injury [could] have been avoided had the employee been trained under a program that was not deficient in the identified respect." See id. Haberle suggests it was "beneath the nationally recognized standards for police department operations" for Troxell "to provoke such a confrontation with a person suffering such a mental illness instead of summoning trained professionals to intervene." See Am. Compl. ¶¶ 39, 47. Haberle's argument, therefore, is that Troxell should have been trained that knocking on the door under these circumstances, without waiting for specially-trained personnel to arrive or for communication to be established with the occupants through some other means, may violate the constitution. The Court is wary of the suggestion that a municipality may be constitutionally liable if it does not train its officers that they must refrain from attempting to quickly ascertain the status of persons who may be in danger (even if it is from themselves) or in need of immediate medical attention. See United States v. Tarburton, 610 F. Supp. 2d 268, 277 (D. Del. 2009) (recognizing that when officers were alerted by the plaintiff's ex-girlfriend that he was contemplating suicide and responded to his home, they were faced the "emergency . . . [of] determining whether a potentially suicidal individual was in the home and in need of assistance"); see also Ziegler v. Aukerman, 512 F.3d 777, 786 (6th Cir. 2008) ("To require that an officer who has received information from a credible source, or sources, that an individual is a suicidal risk, wait to obtain a warrant before saving that victim, would likely result in countless preventable deaths.").

For these reasons, Haberle has not alleged a viable claim, in the absence of any underlying constitutional violation, that either the Borough or Troxell's supervisors are constitutionally liable.

### III.    Troxell did not intentionally inflict emotional distress upon Nixon.

Haberle claims that Troxell's "extreme and outrageous conduct" inflicted emotional harm upon Nixon prior to his death. Am. Compl. ¶¶ 85-87. Under Pennsylvania law, a plaintiff seeking to prevail on a claim of intentional infliction of emotional distress "must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff" and the "plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." Swisher v. Pitz, 2005 PA Super 56, ¶ 7 (quoting Reeves v. Middletown Athletic Ass'n, 2004 PA Super 475, ¶ 16); see Reedy v. Evanson, 615 F.3d 197, 231-32 (3d Cir. 2010). To rise to the level of outrageous or extreme conduct, "[t]he conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." See Hoy v. Angelone, 720 A.2d 745, 754 (Pa. 1998) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super. Ct. 1987)).

For the same reasons that Troxell's conduct does not shock the conscience, his conduct was neither outrageous nor extreme. The only contact that Nixon had with Troxell was Nixon hearing—from the other side of a door—that Troxell had knocked and identified himself as a police officer. That is not outrageous or extreme conduct.[19]

---

[19]    Haberle also advanced a claim of negligent infliction of emotional distress in her Amended Complaint against a number of the individual Defendants, but she subsequently agreed to withdraw it. See Pl.'s Mem. Opp'n 7 n.3. Additionally, Haberle plead claims entitled "Wrongful Death" and "Survival Action" against each of the Defendants. "Under Pennsylvania law, however, the survival statute does not provide for an independent cause of action. Rather, it provides merely a vehicle for a decedent's estate to press causes of action that the decedent would have had, had he lived." Heckensweiler v. McLaughlin, 517 F. Supp. 2d 707, 719 (E.D. Pa. 2007). Her independent "Survival Action" claim, therefore, is dismissed.

With respect to her wrongful death claim, this claim is barred by Pennsylvania's Political Subdivision Tort Claims Act. Under the Act, local agencies such as the Borough of Nazareth are not liable "for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof," subject to eight exceptions enumerated in the Act that do not apply. See 42 Pa. Cons. Stat. §§ 8541, 8542(b); Spiker v. Whittaker, 553 F. App'x 275, 281 n.6 (3d Cir. 2014). Individual employees can be stripped of their immunity if they engage in conduct found to constitute "a crime, actual fraud, or willful misconduct," which includes intentional torts. See 42 Pa. Cons. Stat. § 8550; Martin v. City of Reading, 118 F. Supp. 3d 751, 780 n.24 (E.D. Pa. 2015).

**IV.** **The Borough of Nazareth did not violate the Americans with Disabilities Act.**

"Title II of the [Americans with Disabilities Act] commands that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'" <u>City & Cty. of S.F., Cal. v. Sheehan</u>, 135 S. Ct. 1765, 1772 (2015) (citing 42 U.S.C. § 12132). A number of courts have concluded that the ADA applies to various types of police activity, either because the phrase "services, programs, or activities" is broad enough to "encompass 'anything a public entity does,'" <u>see</u> <u>Sheehan v. City & Cty. of San Francisco</u>, 743 F.3d 1211, 1232 (9th Cir. 2014) <u>rev'd in part, cert. dismissed as improvidently granted in part</u>, 135 S. Ct. 1765) (quoting <u>Barden v. City of Sacramento</u>, 292 F.3d 1073, 1076 (9th Cir. 2002)), or because § 12132's prohibition of discrimination is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context," <u>see</u> <u>Bircoll v. Miami-Dade Cty.</u>, 480 F.3d 1072, 1083 (11th Cir. 2007) (quoting <u>Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.</u>, 133 F.3d 816, 822 (11th Cir. 1998)). <u>See</u> <u>Sheehan</u>, 135 S. Ct. at 1773.

Whether, and to what extent, the protections of the ADA apply to police activity under exigent circumstances, particularly when police are confronting armed, mentally ill individuals who may be violent, has generated a difference of opinion. <u>See</u> <u>id.</u> at 1778 (Scalia, J., concurring in part and dissenting in part). In one circuit, the ADA is categorically inapplicable under these circumstances, at least during the time "prior to the officer's securing the scene and ensuring that there is no threat to human life." <u>See</u> <u>Hainze v. Richards</u>, 207 F.3d 795, 801-02 (5th Cir. 2000) (holding that "Title II does not apply" under those circumstances). Other circuits, recognizing the

---

Haberle acknowledges that her wrongful death action therefore depends upon the viability of her intentional infliction of emotional distress claim—the only intentional tort her Amended Complaint alleges. <u>See</u> Pl's Mem. Opp'n 32. With the dismissal of that claim, her wrongful death claim is also dismissed.

breadth of the ADA's protections, have not found that window of time to be an "ADA-free zone." Instead, these courts have concluded that "[t]he exigent circumstances presented by criminal activity and the already onerous tasks of police on the scene go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." See Bircoll, 480 F.3d at 1085; accord Sheehan, 743 F.3d at 1232; see also Waller ex rel. Estate of Hunt v. Danville, Va., 556 F.3d 171, 175 (4th Cir. 2009) (assuming "for purposes of argument that a duty of reasonable accommodation existed"); Tucker v. Tennessee, 539 F.3d 526, 536 (6th Cir. 2008) (finding that the accommodations sought were not reasonable under the circumstances without deciding whether the ADA applied).

The Third Circuit has not addressed this question. One court in this district has, and the court elected to follow the approach of Hainze. See Hogan v. City of Easton, No. 04-759, 2006 WL 2645158, at *10 (E.D. Pa. Sept. 12, 2006) (citing Hainze, 207 F.3d at 801) (concluding that the case fell outside of "the ambit of the ADA and its requirement of reasonable accommodations" because "there was a need to secure the scene and the safety of the Officers and others"). Other courts in this district have acknowledged the issue, but were able to avoid deciding which approach to follow because the claims did not arise during that window of time where the officers have not yet secured the scene and ensured that there is no threat to human life. Heckenswiler v. McLaughlin, No. 06-4151, 2008 WL 4442945, at *17 (E.D. Pa. Sept. 29, 2008) (finding Hainze to be inapposite because "there [was] no evidence that police officers ever felt a threat of immediate harm"); Morais v. City of Phila., No. 06-582, 2007 WL 853811, at *13 (E.D. Pa. Mar. 19, 2007) (finding that the Hainze rule did not apply because "there was no immediate threat to human life").

Under the <u>Hainze</u> and <u>Hogan</u> approach, Haberle's claim must fail. The circumstances here are not the same as those in <u>Hainze</u>, where a mentally ill individual armed with a knife advanced on a police officer. <u>See</u> 207 F.3d at 797. Nonetheless, the same considerations that led the <u>Hainze</u> court to conclude that the ADA was inapplicable apply here as well. Recognizing that "[l]aw enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations," the court reasoned that "requir[ing] the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents." <u>See</u> <u>id.</u> at 801. While the court acknowledged that "the purpose of the ADA is to prevent discrimination of disabled individuals," it concluded that it was not Congress's intent "that the fulfillment of that objective be attained at the expense of the safety of the general public." <u>Id.</u> As discussed in connection with Haberle's § 1983 claims, at the time that Troxell approached the apartment and knocked on the door, the responding officers did not know whether Nixon was still in the apartment or whether he was at large in the community with the firearm he had stolen, whether he may have posed a threat to anyone who was in the apartment, or whether Nixon or anyone else in the apartment was in need of medical attention. Nixon's decision to knock on the door, therefore, was made before police had secured the scene and ensured that there was no immediate threat to human life. <u>Cf.</u> <u>Heckenswiler</u>, 2008 WL 4442945, at *17 (finding that <u>Hainze</u> did not apply where a subject "was barricaded in his house" by himself and "surrounded by police officers"); <u>Morais</u>, 2007 WL 853811, at *13 (finding the same where "police had confined [the subject] to his apartment, closed the nearby street to traffic and pedestrians, and secured the apartment building").[20]

---

[20]     Relying upon <u>Schorr v. Borough of Lemoyne</u>, 243 F. Supp. 2d 232 (M.D. Pa. 2003), Haberle argues that

The result would be no different under the alternative approach that the other circuits

follow. To those circuits, the question is not whether the ADA applies but whether the requested

"modification of police procedures [would be] reasonable before the police . . . [have] secure[d]

the scene, and ensure[d] that there is no threat to the public or officer's safety." See Bircoll, 480

F.3d at 1085. With all that the officers did not know when they arrived on the scene, requiring

them to accommodate Nixon's condition by prohibiting them from making an attempt to

immediately assess the situation first-hand "go[es] beyond what is meant by 'reasonable

accommodation.'" See Waller, 556 F.3d at 176. The officers had to quickly determine whether

---

Hainze does not control her claim. She argues that her complaint is not that the officers failed to accommodate Nixon's disability under the exigent circumstances in the field, but rather that the Borough of Nazareth failed to adopt proper policies to train officers how to manage these situations. See Pl.'s Sur-Reply Br. 6-7, ECF No. 29. In Schorr, the court was presented with a claim that the local police commission had failed to properly train officers who shot and killed a man suffering from bipolar disorder during a violent confrontation. See 243 F. Supp. 2d at 233, 238. The court held that the rule of Hainze did not apply because the claim in Hainze was only that the individual officers failed to make reasonable accommodations under exigent circumstances, whereas the plaintiffs in Schorr were focused on the police commission's failure to properly train the officers. See id. at 238. The court found that "[t]he Hainze rationale for disallowing ADA claims when the challenged conduct occurred during 'exigent circumstances' [did] not apply" to the failure to train claim because the commission's failure to adopt proper training policies "did not occur the day that the officers shot [the victim]; it occurred well before that day, when the . . . policymakers failed to institute policies to accommodate disabled individuals." Id. To the Schorr court, the fact that there may have been "exigent circumstances at the time of arrest [was] therefore irrelevant," because it was the "fail[ure] to properly train the officers" that "result[ed] in the death of [the victim]." Id.

There are two difficulties with this reasoning. The first is that the plaintiff in Hainze made precisely the same claim that was made in Schorr—that the defendants "fail[ed] to establish a policy or train deputies to protect the well-being of mentally ill individuals. See 207 F.3d at 798. While the failure to train may be the root cause of one of those violations, the failure to train itself does not violate the ADA if the disabled individual is not actually denied the benefits of a public service or discriminated against on the basis of his or her disability. See Waller, 556 F.3d at 177 n.3 (citing City of Canton, 489 U.S. at 388) ("While plaintiff attempts to pose training in dealing with those with mental health problems as an 'accommodation,' it is well-settled that the failure to train must have caused some violation of law for an action against a municipality to lie."); Hogan, 2006 WL 2545158, at *9 (recognizing that a municipality "cannot . . . be liable unless there was some form of underlying discrimination," which means that the "failure to train must be causally connected to the . . . [o]fficers' actions"); see also H.R. Rep. No. 101-485, at 50 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 473 ("In order to comply with the non-discrimination mandate, it is often necessary to provide training to public employees about disability . . . [because] discriminatory treatment based on disability can be avoided by proper training." (emphasis added)).

23

Nixon was present, whether anyone else was in danger, and whether he or anyone else needed assistance. Even if Troxell's approach was not the best one, particularly with the benefit of hindsight, that does not mean that it would be reasonable under these circumstances to require the officers to modify their procedures by taking that option away from them. Haberle proposes that the officers should have instead made other attempts to communicate with Nixon or the other occupants of the apartment, see Am. Compl. ¶ 34, or "summon[ed] [her] to the scene to attempt to reason with [him]," see id., or waited for "trained crisis negotiators from the Pennsylvania State Police to be summoned to the scene," see id. at 32. Under this approach, however, "it would be unclear to officers which of plaintiff's various alternatives they would be required to pursue," and "[o]fficers would be second-guessed for pursuing one over the other, on the grounds that there was always something more or different that could have been done." See Waller, 556 F.3d at 176. Had the officers waited and instead followed one of these approaches only to find out later that the other occupants of the apartment were in danger, or that Nixon needed immediate aid, or that Nixon had left the apartment with the firearm, those decisions too would be assailed as unreasonable. Accordingly, regardless of whether or not the ADA has a role to play in this context, Haberle has failed to state a claim.[21]

---

[21]     While there is no need to decide which of the circuits' approaches is correct in light of the fact that Haberle's claim would fail under either, these courts may have the better approach than Hainze. The Fifth Circuit did not explain how its conclusion squares with the text of the ADA. Instead, the court concluded that Congress could not have intended for the ADA to apply before police have secured the scene and ensured that there is no threat to human life because of the practical difficulties of requiring officers to "factor in whether their actions are going to comply with the ADA" under those kinds of exigent circumstances. See 207 F.3d at 801. However, the Supreme Court has resisted attempts to confine the ADA to only those scenarios that Congress may have anticipated when the statute was passed, see Pa. Dep't of Corr. v. Yeskey, 524 U.S. 206, 212 (1998), which means that the better approach may be for the Fifth Circuit's concerns to "go more to the reasonableness of the requested ADA modification than whether the ADA applies in the first instance." Sheehan, 743 F.3d at 1331-32 (quoting Bircoll, 480 F.3d at 1085).

**V.      Conclusion**

Timothy Nixon's death was tragic, but these allegations do not make out a basis to impose legal liability for his death on these Defendants. Defendants' motion to dismiss the Amended Complaint is granted. An appropriate order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge